CITY OF JACKSONVILLE and ALEXANDER RAY, City Treasurer and Tax Collector, v. CONTINENTAL CAN Co.

151 So. 488.
Division A.
Opinion Filed December 6, 1933.

*Austin Miller* and *Gov Hutchinson,* for Appellants;
*Rogers & Towers,* for Appellee.

ELLIS, J.—The controversy in this case involves the construction of Section 12 of Article IX of the Constitution of 1885 as applied to the manufacture in the City of Jacksonville of metal containers, which are made of steel and tin in the proportion of ninety-eight and one-half per cent steel and one and one-half per cent tin, by the Continental Can Company of that city.

The company began the manufacture of its product in the city of Jacksonville about the latter part of the year 1930 and paid all taxes assessed against its property for that year and preceding years. For the year 1931 the City assessed against certain real property of the company, described as Tract No. 1, the sum of $167.70; upon certain real estate described as Tract No. 2 the sum of $553.80, and upon personal property of the company located upon that tract the sum of $392.00.

The company paid the taxes assessed upon Tract No. 1 but has not paid the taxes assessed against Tract No. 2, nor the taxes assessed upon the personal property located on that tract. The two assessments of the latter properties amounts to the sum of $945.80.

The company, by appropriate proceedings, sought a restraining order against the city to prevent the collection by it of the taxes assessed upon Tract No. 2 and the personal property located upon that tract, upon the ground that the properties were occupied and used by the company in the

manufacture of steel vessels; that such vessels are manufactured as containers for fruits, vegetables, meats and other food products in which such commodities are marketed; that the vessels consist of steel and tin in the proportion stated, and are often called "tin cans," that the real estate referred to as Tract No. 2 is used as the location for the company's industrial plant consisting of buildings, warehouses, trackage and other facilities, and the personal property on which the tax is levied is used upon the premises in and about the manufacture of the products of the company and that Section 12, Article IX of the Constitution exempts such properties from all taxation for a period of fifteen years.

The city moved to dismiss the bill. The court denied the motion and granted the injunction as prayed for in the bill. The city took an appeal from the decree.

The clause in the Constitution which is involved in this case is as follows:

"Section 12. For a period of fifteen years from the beginning of operation, all industrial plants which shall be established in this State on or after July 1st, 1929, engaged primarily during said period in the manufacture of steel vessels, automobile tires, fabrics and textiles, wood pulp, paper, paper bags, fiber board, automobiles, automobile parts, aircraft, aircraft parts, glass and crockery manufacturers and the refining of sugar and oils, and including by-products or derivatives incident to the manufacture of any of the above products, shall be exempt from all taxation, except that no exemption which shall become effective by virtue of this amendment shall extend beyond the year 1948.

"The exemption herein authorized shall not apply to real estate owned and used by such industrial plants except the

real estate occupied as the location required to house such industrial plants and the buildings and property situated thereon, together with such lands as may be required for warehouses, storage, trackage and shipping facilities and being used for such purposes."

The able chancellor before whom the case was presented rested his conclusion upon the proposition that the words "steel vessels" appearing in the Section of the Constitution above quoted "are to be given their ordinary and general meaning and not a limited or restricted meaning and that the word 'vessel' when so defined, means 'container.'"

In the nature of the circumstances and conditions necessarily arising in the administration of the affairs of the government those who are charged with official duties of any character must construe the Constitution and laws in numerous instances. Every department of government must, in the first instance at least, be the judge of its powers. Only in that class of cases which is addressed to the discretion of other departments may no occasion arise for judicial construction. In a case like this, however, the question, which involves a private as well as a public right, may be brought to the attention of the judiciary. The Constitution is to be interpreted and effect given to it as a paramount law and is equally obligatory upon individual citizens and all departments of government.

General principles governing the construction of statutes are applicable to the construction of Constitutions with some modification. A Constitution is the framework of the government. It contains the general principles on which the government must function. Technical rules of construction therefore are not to be applied so as to defeat the principles of government or the object of its establishment. The fundamental purpose in construing a constitutional

provision is to ascertain and give effect to the intent of the framers and the people who adopted it. The object sought to be accomplished therefore must be kept constantly in view. The provisions of a written Constitution are presumed to have been more carefully and deliberately framed than is the case with statutes, hence it would seem that less latitude should be taken by the courts in construing Constitutions than in the construing of statutes, but it is a well settled principle of construction that the construction should not be technical nor liberal but the aim should be to give effect to the purpose indicated by a fair interpretation of the language; the natural signification of the words used in the order and grammatical arrangement in which they have been placed. If the words thus regarded convey a definite meaning and involve no absurdity or contradiction between the parts of the same instrument, no construction is allowable.

The words and terms of a Constitution are to be interpreted in their most usual and obvious meaning, unless the text suggests that they have been used in a technical sense. The presumption is in favor of the natural and popular meaning in which the words are usually understood by the people who have adopted them.

. The above principles are generally accepted as sound in the construction of State Constitutions. See Crawford v. Gilchrist, 64 Fla. 41, 59 South. Rep. 963, Ann. Cas. 1914 B 916; Board of Public Inst. of Polk County v. Board of Co. Comm'rs of Polk County, 58 Fla. 391, 50 South. Rep. 574; Mugge v. Warnell Lumber & Veneer Co., 58 Fla. 318, 50 South. Rep. 645; State, *ex rel.* Atty. Gen. v. Bryan, 50 Fla. 293, 39 South. Rep. 929; State, *ex rel.* West v. Butler, 70 Fla. 102, 69 South. Rep. 771; Wooten v. State, 24 Fla. 335, 5 South. Rep. 39; 1 L. R. A. 819; 12 C. J. 699, 702.

It has been said that as statutes are hastily and unskill-fully drawn they need construction to make them sensible, but Constitutions import the utmost discrimination in the use of language; that which the words declare is the meaning of the instrument. It must be very plain, nay absolutely certain, that the people did not intend what the language they had employed in its natural signification imports before a court should feel at liberty to depart from the plain mean-ing of a constitutional provision. See Newell v. People, 7 N. Y. 9; Gibbons v. Ogden, 9 Wheat. (U. S.) 1, 6 L. Ed. 23.

In construing the Constitution we are performing a work for the million several hundred thousand people of this State. We should not employ that strict construction used in criminal law, but such a construction which will carry out the real intention of the people in making the instrument through their representatives. To that end the principle applied by the learned chancellor was undoubtedly correct.

The provision of the Constitution under consideration in this case was proposed by the Legislature of 1929 before the "economic depression" had lifted its ugly head so as to be visible to the people generally. Our State was prosper-ous. There were large balances in the different State funds as late as June 30, 1928, and in June, 1929, there were also large balances amounting to $5,299,034, exceeding the bal-ance of the previous year by more than $516,000. See Ap-pendix, Laws 1929, pages 1249, 1258.

The people through their representatives in Legislature assembled evidently desired to encourage the establishment of "industrial plants" in this State. A class of industries was selected with evident regard to the possibilities exist-ing in this State for the manufacture of their product. The industries selected which should be exempt from taxation

were the manufacture of "steel vessels, automobile tires, fabrics and textiles, wood pulp, paper, paper bags, fiber board, automobiles, automobile parts, aircraft, aircraft parts, glass and crockery manufacturers and the refining of sugar and oils, and including by-products or derivatives incident to the manufacture of any of the above products."

There is not a place in the State where any one of the above industries may not be effectively carried on in view of the excellent public road, railroad and water transportation facilities which exist here, unless the strict and narrow construction is placed upon the term "steel vessels" sought to be placed upon it by the city. If that construction obtains there would be a very limited number of places in the State where such an industry could with the minimum degree of business discretion be located. Possibly Pensacola, Panama City, Jacksonville, Tampa, Ft. Myers, Miami, and Key West constitute the only available sites for such a shipbuilding plant as may engage in the building of steel vessels designed for the carriage of passengers and freight.

Under the rule of *noscitur a sociis* or *ejusdem generis* the term "steel vessels" would bear no such interpretation. The term vessel is a general term meaning container. The primary definition given to the word by Webster's New International Dictionary is: "A hollow or concave utensil for holding anything; a hollow receptacle of any kind, as a hogshead, barrel, firkin, bottle, kettle, cup, bowl, etc." The fourth definition given is: "Any structure, esp. a hollow one, made to float upon the water for purposes of navigation; a craft for navigation of the water, often, specif., one larger than a common row boat; as, a war *vessel;* a passenger *vessel.*"

However well the construction of the term contended for by the learned counsel for the City may proclaim his am-

bitious hopes for the growth of the splendid City of Jacksonville, we are constrained to the opinion by the well recognized rules of constitutional construction that the people were not considering, in the use of the term "steel vessels" in connection with the manufacture of "paper bags," "fabrics and textiles," "fiber board" and "crockery," the possibility of the building in this State of "steel war vessels," or ocean-going "steel boats" for the carriage of people and freight in world transportation.

We are of the opinion that the decree appealed from was correct; so the decree is affirmed.

DAVIS, C. J., and WHITFIELD, TERRELL and BUFORD, J. J., concur.

BROWN, J., not participating because of illness.